ODOs. And that they were going to come in and once we processed the inspection and acceptance reports that the contract would then move into Section 2. And then 30 days after moving into Section 2 with the R970 -- am I talking too fast? I tend to talk too fast.

Q. For me a little bit. I'm concerned about Ms. Draham, the court reporter.

THE COURT REPORTER: You're fine. Thank you.

THE WITNESS: Based on the fact that it moved into Section 2 with the R970, as long as the department code was S, 30 days later the contract would close out.

BY MR. PORTELLA:

Q. And that procedure was not in place prior to November 1997; correct?

A. No. I think it was implemented in -- I don't want to give a date but I believe it was in '99, sometime in '99.

Q. Do you have any knowledge that that procedure where the R970 went into Section 2 in


53068743-2e58-4816-b26d-e61701b843c3

Q. Do you know when that was?
A. In 1999, around then.
Q. Did you have any involvement at all with that?
A. No.
Q. Do you know who did?
A. At that time I think the person in charge was Vivian Hill and I think that one of the testers was Pat Hartley.
Q. Do you have any knowledge of the result of the acceptance test plan?
A. It was implemented.
Q. How do you know that?
A. It's in effect today.
Q. Did you work for the government when it went into effect?
A. Yes.
Q. Do you remember what year it went into effect?
A. I believe it was 1999.
Q. Do you have any idea how much the government saved as a result of this implementation?
A. No.

pertaining to a completely different piece of the suggestion as opposed to the suggestion that we were just talking about. That is a different piece completely. That proposed suggestion is -- okay.

What it was supposed to do, SAMMS was supposed to talk to MOCAS. MOCAS, when we processed the DT250, was supposed to go in and say shipment performance notice, okay. They were supposed to send something in and have the shipment performance notice updated that the contractor or that somebody, the depo, the receiving activity, somebody received the item and that we now can close it out because that's what they're concerned with, that the item was received. That piece was never implemented. Everything else was.

Q. Okay. So was there something implemented that is a key to notify MOCAS personnel which ODOs are already paid?

A. No.

Q. Now, if something comes in at night during the process batching that is a -- it comes EDI from SAMMS to MOCAS with a payment code of 16,

with a department code of S and the inspection and acceptance are balanced MOCAS puts it into -- and it comes in R970; okay?

A. Okay.

Q. When that information comes in does MOCAS recognize it as a SAMMS contract?

A. I need to make a correction to what you said.

Q. Yes, you can.

A. Okay. A contract comes in from SAMMS at night in a batch, the contract comes in, it has a payment office code of 16. Based on the fact that it's coming in from MOCAS -- from SAMMS with a payment office code of 16, the EDI transaction then translates that. There's a translation that occurs, okay. And just so you understand, no matter how many people make the suggestion the programmers have to program that, okay.

So a translation occurs, Payment Office 16, DLA; DLA, we need to generate an R970; DLA, we need to generate a Department Code S; DLA, we need to put a payment, SAMMS payment office in the long line. So a translation occurs from the EDI transaction that comes in from SAMMS to MOCAS,

okay.
Once that's done then it's DCMA's responsibility. DCMA then gets a DT250, okay. The DT250 then says, okay, hey, I'm shipped complete, I got what you wanted, you ordered 1,000 bottles of Advil, which I could use some right now, okay, and we've got them all. So now we're complete. We're equal. We've received 1,000 bottles. We shipped 1,000 bottles. We accepted 1,000 bottles. Everything is equal in MOCAS. MOCAS then moves the contract from Section 1 to Section 2 automatically, okay.
Then what happens is the department code is S, the payment office code is 16, the payment office identifies DLA, there's an R970, it's sitting in Section 2, thirty days later it closes out. That part was implemented.
The part that was not implemented was to have DCMA -- or MOCAS, not DCMA -- to have MOCAS identify to SAMMS that we've shipped that, that you've got what you wanted, Mr. Depo, Mr. Customer, you've gotten what -- that part was not implemented. That's what that FIC code is, Q, or a FIC code where we've notified DCMA that the

ORIGINAL


IN THE UNITED STATES COURT OF FEDERAL CLAIMS

\- - -

SIMONE ANDERSON, Plaintiff : NO. 03-2671C

vs. :

THE UNITED STATES, et al, Defendants :

\- - -

Oral deposition of DONALD ANDREWS, taken pursuant to notice, held at the offices of PORTELLA & BJORKLUND, LLC, 126 White Horse Pike, Haddon Heights, New Jersey, on Tuesday, April 26, 2005, beginning at 9:38 a.m., before Kelly A. Draham, Shorthand Reporter-Notary Public, there being present.

\- - -

ZANARAS REPORTING AND VIDEO
REGISTERED PROFESSIONAL REPORTERS
1616 Walnut Street, Suite 300
Philadelphia, Pennsylvania 19103
2112 Bay Avenue
Ocean City, New Jersey 08226
(215) 790-7857 1-877-GO-DEPOS

Instead of having somebody manually key the stuff in it would do it systemically.

Q. Between the two computer programs, SAMMS and MOCAS?

A. It could almost update, if we were using straight EDI, you could update both simultaneously. You wouldn't have to send it from one to the other. You could take that EDI document and send it to both systems.

Q. Go down to the last full paragraph on page OLA100 of D-12, specifically the first couple sentences starting out with Bart Hogan.

A. Okay.

Q. Can you read that out loud slowly onto the record?

A. Okay. Bart Hogan wrote AWR UN00H98-004, automatic closeout of DLA other disbursing office contracts on December 12, 1997.

Q. Keep going.

A. This AWR originally called for DLA ODO contracts to be assigned to the contract administration report Part B to permit automatic closeout.

Q. Stop. Are you familiar with what that

to find out where the suggestion stood, what their final resolution was because it had to go down to them for approval because it was a DLA-wide suggestion, and what they came back and said was but this was disapproved because the fix is already being made, we have another method. And then we kind of coordinated back and forth kind of laying out the timing of the whole thing.

So in talking to the person down at headquarters they were under -- that's where the confusion arose as to whether this fix was created independent of the suggestion or whether it was created as a result of the suggestion.

Q. Did they show you any documents to show that this solution independent of Ms. Anderson's suggestion predated Ms. Anderson's suggestion of November 17, 1997?

A. No.

Q. Did they tell you orally that they had documents predating Ms. Anderson's suggestion of November 17, 1997 showing that this problem was being worked on, this contract closeout problem in MOCAS from contracts paid in SAMMS?

A. No.

Q. Did they show you any evidence of any sort showing that this problem was being worked on prior to Ms. Anderson submitting her suggestion to correct this problem on November 17, 1997?
A. No.
Q. Are you aware independently of any evidence showing that the government was working on rectifying this problem prior to November 17, 1997?
A. I am not.
Q. Did the people at headquarters give you any reason to believe that this problem was rectified other than by a solution generated by Ms. Anderson?
A. No.
Q. Your correspondence with headquarters regarding this issue to find out the status of Ms. Anderson's suggestion, was that what you had said earlier, these extensive meetings regarding this suggestion? Were there meetings held about this?
A. No, that's two different things. What I had mentioned earlier were meetings up front when it was being prepared and when it was being

suggestion being accepted and implemented?
A. I did.
Q. Okay. We'll get to that.
Are you aware of anybody receiving an award under the incentive plan which was referenced in D-1 for automatic contract closeouts in MOCAS from other distributing offices?
A. I'm not aware of it.
Q. If Bart Hogan wrote the AWR, that, correct me if I'm wrong, is not an employee suggestion subject to an incentive award; correct?
A. That's correct.
Q. So if that AWR was implemented to automatically close out the MOCAS contracts and it was written by Bart Hogan, Bart Hogan was not entitled to an award under an incentive program; correct?
A. If it did not go through the incentive program, that's correct.
Q. Do you know if the AWR went through the incentive program?
A. I do not know.
Q. So the government, in accepting the AWR written by Mr. Hogan, didn't have to pay anybody

Q. Two questions, I'll ask you one at a time. What figure was identified, No. 1? No. 2, who identified it? So No. 1, what figure was identified?

A. The figure ranged -- I believe it ranged from $7 million to $1.5 billion a year.

Q. Do you know who identified that number?

A. I don't recall who identified it. I know that I saw it in an e-mail message is where I remember the number. I don't know who came up with the actual figure.

\- - -

(Whereupon the court reporter marked D-15 and D-16 for purposes of identification.)

\- - -

(Whereupon a short break was taken at this time.)

\- - -

BY MR. PORTELLA:

Q. Mr. Andrews, I'm showing you what's been marked D-15. Read that over and tell me if you know what that is?

A. It's an e-mail from me.

Q. Who was it sent to?

- - -

BY MR. PORTELLA:

Q. Do you know without looking at the AWR what procedure was implemented in closing out automatically contracts administered in MOCAS that were paid by SAMMS or the ODO?

A. I do not.

Q. Without showing you the AWR I'll ask you if you were to read it could you explain it to us?

A. Probably.

Q. I'm looking at Exhibit D-10, the page marked OLA58, the Section 3.1. Read it and then tell me whether or not you could explain it to me in what I will call lay terms.

A. Okay.

Q. What does it mean?

A. How I read this, what it means is that any of the ODO lines for DLA contracts that are billed in MOCAS will contain a value of 70 in the R9 field in MOCAS, in that field for the transaction in MOCAS. And when it's -- logic was developed so that whenever it sees that value of 70 it's going to automatically move this from a

section of MOCAS to a separate section, the other section, Section 5. And that Section 5 means that it's an automatic closeout. It's instantly going to close that record.

Q. Does that relate to MOCAS contracts being paid through SAMMS?

A. Yes.

MR. PORTELLA: Nothing further.

MR. MAGER: Nothing further.

- - -

(Whereupon the witness was excused and the deposition was concluded at 1:29 p.m.)


c39a729b-2d6b-46f1-a5f3-7bdbb1205883

ORIGINAL



IN THE UNITED STATES COURT OF FEDERAL CLAIMS

\- - -

SIMONE ANDERSON, : NO. 03-2671C
Plaintiff :
:
vs. :
:
THE UNITED STATES, et al, :
Defendants :

\- - -

Oral deposition of RAYMOND BREUNINGER, taken pursuant to notice, held at the offices of PORTELLA & BJORKLUND, LLC, 126 White Horse Pike, Haddon Heights, New Jersey, on Tuesday, April 26, 2005, beginning at 1:41 p.m., before Kelly A. Draham, Shorthand Reporter-Notary Public, there being present.

\- - -

ZANARAS REPORTING AND VIDEO
REGISTERED PROFESSIONAL REPORTERS
1616 Walnut Street, Suite 300
Philadelphia, Pennsylvania 19103
2112 Bay Avenue
Ocean City, New Jersey 08226
(215) 790-7857 1-877-GO-DEPOS

deposition that that changeover in the type of pay, and this is my phrase, that MOCAS contracts were being paid by SAMMS, when that change occurred it seemed to cure one problem but caused another problem. That's my phrase.

But are you aware of any problems that came about based upon the change in payment system?

A. The main problem from my perspective in DCMC was that the DCMC contract administrators and ACOs had no visibility to any payment problems or concerns.

Q. Okay. Let me direct now the problem a little bit more.

Was there a problem with closing out the contracts in MOCAS when SAMMS made the payment to the vendor?

A. I'm not a contract administrator, but since they did an automatic closeout procedure I assume there were some problems. But I did not really get involved in what caused the problems. I just know that they implemented an automatic closeout process.

Q. Did you ever work with Ms. Anderson

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - -

SIMONE ANDERSON, )
Plaintiff, ) No. 03-2671C
vs. ) (Judge Allegra)
UNITED STATES OF AMERICA, )
DEPARTMENT OF DEFENSE, DEFENSE )
LOGISTICS AGENCY, DEFENSE PERSONNEL )
SUPPORT CENTER, DEFENSE SUPPLY CENTER )
- PHILADELPHIA, DEFENSE FINANCE AND )
ACCOUNTING SERVICE, DEFENSE CONTRACT )
MANAGEMENT COMMAND, DIRECTORATE OF )
CLOTHING AND TEXTILE, jointly, )
severally and in the alternative, )
Defendants. )

- - - - - - - - - - - - - - - - - - -

Wednesday, May 4, 2005
1:30 p.m.

DEPOSITION OF VIVIAN HILL

CERTIFIED COPY

A. MOCAS. I could tell you how MOCAS operates now.

Q. Sure. How does MOCAS operate now specifically with respect to closing out contract lines from ODOs?

A. The way that it operates now is that other disbursing offices -- that's what ODOs mean -- says that MOCAS does not see or does not know when a contractor has been paid. So we have a line item for a good or a service. The only thing that we do know in MOCAS is that we have completed the service or we have shipped the good. We never know whether the contractor has been paid, which is the final step in contract closeout.

So ODOs are closed out based upon final shipment information or a phone call to whoever was supposed to receive the good and service to say they received the good or service.

Q. Okay. Finished?

A. Done.

Q. Okay. Is SAMMS still in existence?

A. As far as I know.

Q. As far as you know are there contracts presently administered through MOCAS but paid through SAMMS?
A. As far as I know, yes.
Q. What happens now when you have a MOCAS-administered contract which is paid through SAMMS and you now need to close out the contract line in MOCAS? What happens?
A. What happens now is just as I described. We know that the item has been shipped. We don't know whether it's been paid.
Q. How do you find out when it's been paid through SAMMS?
A. We don't.
Q. Doesn't that cause problems?
A. It does, yes.
Q. So if MOCAS doesn't know when SAMMS has paid, how do you find out?
A. We don't. Where your policy change -- where your policy comes in is that we decided that's the way it was going to be. The only way we were able to close it out was close it out based

**Andrews, Donald**

**From:** Anderson, Simone
**Sent:** Friday, January 22, 1999 8:28 AM
**To:** Venti, Theresa
**Cc:** Andrews, Donald
**Subject:** FW: FW: Re[3]: SCR - USPH98006 (PS)

Theresa,

Here is a follow-up to my suggestion that was implemented as you will see on the 20 Nov. 98. Two things:

1. Try to find out when it willbe implemented for DSCP.
2. Who is working the savings for this?

Please let me know by email or talk to Don Andrews.

Thanks,
Simone

-----Original Message-----
From: maykowskyj, diana [mailto:diana_maykowskyj@hq.dla.mil]
Sent: Thursday, January 21, 1999 4:06 PM
To: 'Simone Anderson'
Subject: FW: FW: Re[3]: SCR - USPH98006 (PS)

Simone, FYI Dave Schimmels message regarding the above SCR. Do you need anything else from us?

Best wishes to you in your new endeavors. I want to thank you for all your assistance over the past couple of years. You were a tremenduous asset on the post award issues for me, and I truly appreciate all the help and support you provided. I know you will do well wherever you are. Keep us in your thoughts. Sincerely, Diana Maykowskyj

PS I should tell you I have accepted a position in the DLA Small Business Office. My release date is Feb 21. I wasn't looking, but it was offered and I decided it was time to move on to something different. No promotion, just a lateral.

Good LucK to you.

> -----Original Message-----
> From: schimmel, david
> Sent: Thursday, January 21, 1999 10:42 AM
> To: maykowskyj, diana; schimmel, david
> Cc: weber, lynne
> Subject: RE: FW: Re[3]: SCR - USPH98006 (PS)
>
> Sorry ... I know it's "Diana"!
> Dave
>
>
> ______________________________ Reply Separator
> ______________________________
> Subject: Re: FW: Re[3]: SCR - USPH98006
Author: david schimmel at ccpo17
Date: 1/21/99 1:40 PM
>
>

EXHIBIT
PENGAD 800-631-6989
D-17
4-26-05KD

OLA 139

> Diane,
> I checked with Lynne Weber (our "P" POC) ...
> DSDC has completed all required work.
> Program is already operational @ DISC.
> Was also released to DSCC/DSCR for installation (imminent).
> Dave
>
>
> ______________________________ Reply Separator
> _________________________________
> Subject: FW: Re[3]: SCR - USPH98006
> Author: diana maykowskyj at HQ
> Date: 1/13/99 6:05 PM
>
>
> Dave, would you please send me an update on the subject SCR. I lost my
> last
> update with the transition to outlook. thanks. diana
> -----Original Message-----
> From: Anderson, Simone [SMTP:paa1329@exmail.dscp.dla.mil]
> Sent: Wednesday, January 13, 1999 12:50 PM
> To: 'diana_maykowskyj@hq.dla.mil'
> Subject: RE: Re[3]: SCR - USPH98006
>
> Diana,
>
> Whatever happened with this? Was it implemented? Please let me know.
>
>
> Simone
>
> -----Original Message-----
> From: diana_maykowskyj@hq.dla.mil [mailto:diana_maykowskyj@hq.dla.mil]
> Sent: Tuesday, November 10, 1998 7:02 AM
> To: sanderson@dpsc.dla.mil
> Subject: Re[3]: SCR - USPH98006
>
>
>
> FYI subject SCR info in message below. Diana
>
> ______________________________ Forward Header
> _________________________________
> Subject: Re[3]: SCR - USPH98006
> Author: lynne weber at ccpo17
> Date: 11/10/98 9:36 AM
>
>
> Diana,
>
> I have recieved the WBS from DSDC. The program will be released on
> 11/20/98. They have built in 2 weeks in case any unforeseen problems
>
> come up, so project completion is scheduled for 12/4/98.
>
> LAW
> ______________________________ Reply Separator
> _________________________________
> Subject: Re[2]: SCR - USPH98006
> Author: diana maykowskyj at ccpo12
> Date: 10/30/98 10:48 AM
>
> Thanks, Do they understand the volume of work that is being caused

**OLA 140**

> without it? Do you think we need to press any buttons? Let me know
> Diana
>
>
> ______________________________ Reply Separator
> _________________________________
> Subject: Re: SCR - USPH98006
> Author: lynne weber at ccpo17
> Date: 10/29/98 2:23 PM
>
>
> Diana,
>
> Sorry i hadn't gotten back to you sooner...I've been meaning too!
> Anyway, DSDC will be putting some programmers on this change very
> soon. I should be able to give you a completion date within a week.
> Shouldn't take too long to complete since it is very low hours.
>
> Sorry, I thought they were already working this, but found they
> hadn't
> staffed it yet.
>
> Will advise when I get a schedule.
>
> LAW
>
>
> ______________________________ Reply Separator
> _________________________________
> Subject: SCR - USPH98006
> Author: diana maykowskyj at ccpo12
> Date: 10/22/98 1:34 PM
>
>
> You left me a message that said the subject SCR was approved and
> funded and that it is with DSDC. What I would like to know is: have
> they started work and if not when will they start, and when is
> scheduled to be completed? We are having a tremenduous volume of
> data
> that has to be manually input with out this SCR, which results in
> significant number of errors, and payment are delayed. ODO/Pay Code
> 16
> SCRs were given very high priority because of the associated cost
> savings ($7M-$1.5B annually). What is the priority on this SCR? It
> came to the Agency from DSCP in March 98. If it is pushed out beyond
>
> the end of the year, we should consider reassessing the priority of
> this SCR.
>
>
> Thanks you for your assistance in this matter.
>
> Diana Maykowskyj

OLA 141