COPY



IN THE UNITED STATES COURT OF FEDERAL CLAIMS

\- - -

SIMONE ANDERSON, : NO. 03-2671C
Plaintiff :
:
vs. :
:
THE UNITED STATES, et al, :
Defendants :

\- - -

Oral deposition of LILLIAN LEONE, taken pursuant to notice, held at the offices of PORTELLA & BJORKLUND, LLC, 126 White Horse Pike, Haddon Heights, New Jersey, on Monday, June 6, 2005, beginning at 9:04 a.m., before Kelly A. Draham, Shorthand Reporter-Notary Public, there being present.

\- - -

ZANARAS REPORTING AND VIDEO
REGISTERED PROFESSIONAL REPORTERS
1616 Walnut Street, Suite 300
Philadelphia, Pennsylvania 19103
2112 Bay Avenue
Ocean City, New Jersey 08226
(215) 790-7857 1-877-GO-DEPOS





53068743-2e58-4816-b26d

A. Uh-huh.

Q. Read that over. Tell me if any of that sounds familiar to you. And then I'll ask you another question about that.

A. Yeah. Okay.

Q. You've read it through?

A. Yes.

Q. Does what is contained in there sound familiar to you?

A. Yes.

Q. All right. In your words, without reading what's in D-3, what's being described here?

A. This here, the proposed procedure, okay, was -- they were -- there was another piece. There was a piece of -- okay. How do I put this?

Q. You can take your time too. Don't feel pressured.

A. No. When this proposal came out, okay, there wasn't enough money to implement the whole thing, okay. DCMC always had a cash flow problem. When I say that I don't mean that to be smart. I just meant that there were lots of things that we needed to do to maintain MOCAS. And this piece,

there wasn't enough money for. So while we implemented the majority of the ODO, this was supposed to be done but it was never done.

Q. Does it describe what the problem was that it proposed to change?

A. What this was going to do, it was going to come back and have MOCAS -- it was going to have SAMMS talk to MOCAS. It was going to say, okay, fine, we've made a payment in SAMMS so now you can close out the contract. The problem was they paid by line item, we paid by contract.

So yes, this would have helped if they could have done it at contract level but it wasn't -- we just never got to that piece of it.

Q. Do you know whose suggestion this is?

A. I guess it's Simone Anderson's.

Q. Your sister; right?

A. Uh-huh.

Q. Ms. Leone, do you know if any part of this suggestion was implemented by the government?

A. The part of -- yes. The part of the suggestion that was implemented, okay, was the piece of it that said that they were going to come in and they were going to identify them as DLA

ODOs. And that they were going to come in and once we processed the inspection and acceptance reports that the contract would then move into Section 2. And then 30 days after moving into Section 2 with the R970 -- am I talking too fast? I tend to talk too fast.

Q. For me a little bit. I'm concerned about Ms. Draham, the court reporter.

THE COURT REPORTER: You're fine. Thank you.

THE WITNESS: Based on the fact that it moved into Section 2 with the R970, as long as the department code was S, 30 days later the contract would close out.

BY MR. PORTELLA:

Q. And that procedure was not in place prior to November 1997; correct?

A. No. I think it was implemented in -- I don't want to give a date but I believe it was in '99, sometime in '99.

Q. Do you have any knowledge that that procedure where the R970 went into Section 2 in

A. Uh-huh.

Q. Have you had discussions with anybody at your current place of employment either with Bearingpoint employees or DCMA employees about the ODO contract closeouts, in other words the subject of this lawsuit?

A. Not with Bearingpoint, no.

Q. How about with DCMA or government employees?

A. I asked somebody recently if this piece of the program was ever implemented.

Q. Now, just to make the record clear, you're pointing at page 3 of Exhibit D-3?

A. Right.

Q. Which is your sister's suggestion?

A. Yeah. I was -- it's part of it.

Q. Okay.

A. It's the bottom part with the FIC "Q".

Q. Who did you ask?

A. I asked a quality person.

Q. Is that their title?

A. That's their title, quality assurance.

Q. Do you know the person's name?

A. Yes.

Q. What is it?
A. Claudia Emery.
Q. Claudia Emery?
A. Uh-huh.
Q. Who does she work for?
A. DCMA.
Q. And you asked her about the implementation of the ODO closeout?
A. No.
Q. Okay.
A. I asked her if SAMMS talks to MOCAS yet so that we can get payment information.
Q. And what did she tell you?
A. No.
Q. What else did she say, if anything?
A. She told me she was remodeling her house.
Q. Let's talk about the suggestion.
A. No.
Q. You got me on that one. Okay.
So presently SAMMS and MOCAS don't interface to talk to each other?
A. No.
Q. Do you know if the ODO contract

write an AWR, a system change request, and I maintained my own. I provided copies to everybody but I maintained my own. So at one point in time DSAC would have a copy but they've been disbanded and basically disestablished. So I really don't know to answer your question.

Q. That's easy enough. That's all I can ask for.

Had you ever spoken with Don Andrews regarding Simone Anderson's suggestion?

A. No.

Q. I'm going to direct your attention to Exhibit D-3 again, which you've seen several times today, particularly the page marked OLA40.

First, you testified that the suggestion wasn't implemented in whole because there wasn't enough money?

A. Uh-huh.

Q. Why wasn't there enough money?

A. Well, okay, you have to understand, okay, being a stepchild to DLA, okay, there was always good funding years and bad funding years and a lot of times other things were more important. Public law took precedence over this.

System change requests were so far backlogged because of Y2K, Year 2000, and all money was basically dedicated to Year 2000 testing to make sure that when Year 2000 came nothing would fall through the cracks. So money wasn't available.

Q. Do you have any idea how much the proposed suggestion would have cost or even a general -- I mean, was it a simple thing to implement or difficult?

A. It was, from what I understand, it was difficult because it touched a lot of programs. And you have to understand MOCAS is hard-coded and it would have touched thousands of programs, thousands of different areas within MOCAS.

Q. Okay. Now, just for clarification purposes, you've testified that something, some sort of suggestion regarding ODO was implemented. If you could point out to me the language in the suggestion that was implemented? What particular section because I'm a little unclear on that?

A. Okay. This part, the proposed procedure where it says FIC of Q was not implemented. The part where the contract would come into MOCAS, the part where the contract would

come into MOCAS would be identified with a payment office code of 16, which would identify strictly as DLA, it didn't matter that it was DPSC, it did matter that it was DSCR or DESC or whatever else, okay, if it had a payment office of 16 it would come into MOCAS, it would be identified as DLA, okay.

When it came into MOCAS identified as DLA it would not be in the system as a prime contract. What that means is that it would have no obligation. So nobody in MOCAS would make a payment. It would have an obligation other, which would indicate that it was an ODO.

What happened to it is that when it came into MOCAS it would have an R970, which would indicate that it was a DLA ODO. It would have a department code of S and to -- the other thing that would happen when it came into MOCAS is that it would now be Part A versus Part B.

Q. Now, is that in the text of that suggestion or is that derived from some other source to the best of your knowledge?

A. The piece about Part A and Part B came from Bart Hogan because SAMMS doesn't work on

Part A or Part B. SAMMS works on -- this is a contract that's in MOCAS -- I mean in SAMMS, okay. It doesn't care that they have a $10 purchase order. They give it the same priority.

In MOCAS we don't do that. If we have a firm fixed-price contract, which is what SAMMS contracts are, for a fixed price because we're ordering supplies, when they come in to MOCAS if they're under $100,000, before this suggestion, when they came into MOCAS if they're under $100,000 they would go into Part B. That means we, DCMC, managed them by exception. That means we basically hoped that the DT250 came in, got processed, got paid and closed out.

In 1997 that all changed. In 1997 the contracts came in to MOCAS, okay. We coded them with the R9 -- we coded them in MOCAS as DLA ODOs. At that point in time when they moved into Section 2 because there was no manual -- automatic closeout they sat there because we weren't -- we didn't know whether we were supposed to process DT250s, not supposed to process DT250s, supposed to review, not supposed to review when we knew payment wasn't being made. They just sat there.





53068743-2e58-4816-b26d-e61701b843c3

Q. And now it is irrelevant that payment -- whether or not payment has been made?

A. We have a deviation saying that we're not supposed to care about payment. You process them as inspected and accepted. You process the DT250 saying that we got the items. And somebody has to verify that we've received the items, whether through FASS pay because when you have an invoice FASS pay the contractor is certifying that he shipped that item through UPS, through Parcel Post, some method of shipment. We process it. If we process it with a FASS pay we put it in the system. If all items equal it closes out. If we need the DT250 we process it into the system, all items equal, it moves into Section 2, it closes out.

Q. Okay. The thing I'm unclear on is if you could just, if you can, point to what line of the suggestion states that any of that should be done?

MR. PORTELLA: I'll object to it but you can answer.

THE WITNESS: Okay. I don't understand your question,





53068743-2e58-4816-b26d-e61701b843c3

okay. You're saying what line,
okay. It's saying that the
proposed -- this is saying --
this piece here, it was not
implemented. The piece --

BY MR. MAGER:

Q. For the record, because she can't see what you're pointing to, what --

A. The proposed procedure where it says the FIC of Q, F-I-C, Q, that was not implemented to my knowledge, okay. It wasn't implemented.

Q. That's all we can ask for.

A. It wasn't implemented when I left in 2003, okay. Now, this here --

Q. If you could identify what you're referring to?

A. Okay. Wait a minute. Okay. It says right now everything that is input into SAMMS with a Pay Office 16 moves directly into MOCAS as highly-manual closeout process, okay. That's absolutely true. In 1997 that was absolutely true.

In 1999, in 1999 after they implemented an automated work request change,

okay, what happened in 1999 after they implemented it is that when a payment office of 16 came in the contract with a department code of S with an R970 with a payment office of DLA, once it moved into Section 2 closed out automatically. That's what that's saying, right now it doesn't do that but...

Q. And I'm going to be -- tell me if I'm wrong because I'm going to sort of rephrase what you said.

A. Okay.

Q. So what you're saying is that a change was done based upon the information contained in the current procedure section of the suggestion but that the proposed procedure section was never implemented?

A. Right.

MR. PORTELLA: Objection.

THE WITNESS: The proposed procedure was never implemented. The other piece was.

MR. MAGER: No further questions.

THE WITNESS: Because right now -- wel'





53068743-2e58-4816-b26d-e61701b843c3