# In The United States Court of Federal Claims

No. 03-2671C

(Filed: September 29, 2006)

---

| | |
|---|---|
| SIMONE ANDERSON,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | * Motion to dismiss under RCFC 12 or, in the<br>* alternative for summary judgment under<br>* RCFC 56; Employee suggestion cash award<br>* program – 5 U.S.C. § 4503; Jurisdictional<br>* predicates for judicial review; Implied-in-fact<br>* contract; No material question of fact;<br>* Employee suggestion not accepted by agency<br>* official with appropriate authority; No<br>* contract; Implied-in-law contracts; No<br>* jurisdiction for unjust enrichment claim. |

---

**OPINION**

---

*Matthew V. Portella*, Haddon Heights, New Jersey, for plaintiff.

*Steven M. Mager*, U.S. Department of Justice, Washington, D.C., for defendant, with whom was *Assistant Attorney General Peter D. Keisler.*

**ALLEGRA, Judge:**

Plaintiff, Simone Anderson, alleges that defendant failed properly to compensate her for the use of her employee suggestion to improve the handling of certain accounts payable. Pending before the court is defendant's motion to dismiss under RCFC 12(b)(1), or, in the alternative, for summary judgment under RCFC 56. For the reasons that follow, the court grants this motion.

## I. BACKGROUND

Plaintiff is a former electronic commerce analyst for the Defense Supply Center – Philadelphia (DSCP), a field activity of the Defense Logistics Agency (DLA). DLA, an agency of the Department of Defense (DOD), provides worldwide logistical support to the military and several civilian agencies.[1] At all relevant times, DLA administered, under 5 U.S.C. § 4501 *et*

---

[1] Plaintiff brings suit against the United States, the Department of Defense, the Defense Logistics Agency, the Defense Personnel Support Center, the Defense Personnel Support Center-Philadelphia, the Defense Finance and Accounting Service, the Defense Contract Management Command and the Directorate of Clothing and Textile, jointly and severally. Of course, under the Tucker Act, only suits against the United States are properly before this court. *See* 28 U.S.C. § 1491(a)(1). The court will construe plaintiff's complaint accordingly.

*seq.,* an employee incentive program – the Superior Accomplishments Awards Program (the Accomplishments Program). A DLA Manual (the Manual) sets forth the policies that govern the operation of this program. *See* DLAM 1432.1 (Oct. 19, 1987). A provision therein provides that the agency "may" grant an award to an employee if: (i) the employee has submitted the suggestion in writing; (ii) the suggestion is approved by the benefitting organization; and (iii) the contribution is outside the scope of the employee's job responsibilities or "so superior or meritorious that it warrants special consideration for award." DLAM 1432.1 § 1-7(a). The Manual further states that "[c]ash awards may be granted to employees . . . based on tangible monetary savings, intangible benefits or a combination of both, accruing to DLA/Government from their contributions." *Id.* at § 1-8. While the Manual provides a mechanism for calculating an award relative to the benefit received, it also emphasizes, repeatedly, that "[t]he decision to grant or not grant an award, or to adopt or not to adopt a suggestion, is a management prerogative." *Id.* at § 2-2(g); *see also id.* at § 1-7(e).

On November 17 and 18, 1997, plaintiff submitted an employee suggestion to DLA, which, in accordance with agency procedures, was set forth on an employee suggestion form and given a tracking number – 98-DP-008. On this form, plaintiff proposed a solution to a problem involving the interaction between two computer programs that track, manage and pay DLA contracts. She asserted that, if her suggestion was implemented, it would enable DLA to pay contractors, companies and other entities more quickly than under the then existing system and procedures, thereby diminishing the need for delinquency reports and other agency activities, resulting in across-the-board savings. Because her suggestion potentially impacted numerous users of the relevant computer systems, it was forwarded to various DLA personnel for evaluation.

At this point, the parties' respective positions on the facts diverge. According to plaintiff, her suggestion was given the highest priority, as it was estimated that it might save defendant between $7 million and $ 1.5 billion annually. She contends that her suggestion was approved in early 1999, that she was informed that it was being implemented, and told that she would be receiving an award under the Accomplishments Program. It is undisputed that she did not receive that award or any other compensation under the program. For its part, defendant remonstrates that while several DLA reviewers, including Ms. Anderson's immediate supervisor, recommended that her suggestion be approved, her suggestion ultimately was rejected by the DLA and never implemented. Defendant asserts, relying on various documents, that plaintiff's suggestion would have required costly modifications to computer programs that were nearly obsolete and that the problems she identified were being addressed by other means already being implemented around the time that plaintiff made her initial suggestion. In short, defendant contends that plaintiff did not receive an award for her suggestion because it was not accepted.

On November 17, 2003, plaintiff filed a complaint raising two claims under the Tucker Act, 28 U.S.C. § 1491(a)(1) – one for breach of implied-in-fact contract and the second for unjust enrichment. She alleges that, pursuant to the Accomplishments Program, she is entitled to a maximum of $25,000, with the potential for an additional Presidential award of up to $10,000. On June 20, 2005, the parties completed discovery. On August 8, 2005, defendant filed a motion

to dismiss pursuant to RCFC 12(b)(1), or, in the alternative, for summary judgment under RCFC 56. Following briefing on that motion, the court held oral argument; thereafter, it ordered subsequent briefing.

## II. DISCUSSION

Plaintiff seeks compensation for a suggestion made during her employment, alleging that it was adopted by the DLA, thereby entitling her to an award under the Accomplishments Program. That program is authorized by 5 U.S.C. § 4503, which provides:

> The head of an agency may pay a cash award to, and incur necessary expenses for the honorary recognition of, an employee who –
>
> (1) by his suggestion, invention, superior accomplishment, or other personal effort contributes to the efficiency, economy, or other improvement of Government operations or achieves a significant reduction in paperwork; or
>
> (2) performs a special act or service in the public interest in connection with or related to his official employment.

Plaintiff seeks compensation under two theories: (i) that she had an implied-in-fact contract with the DLA that the agency breached; and (ii) that she is entitled to damages under the doctrine of unjust enrichment. The court will consider these theories *seriatim*.

For plaintiff to recover on her breach of contract claim, she must establish the existence of a valid contract with defendant and a breach of a duty created by that contract. *San Carlos Irrigation & Drainage Dist. v. United States*, 877 F.2d 957, 959 (Fed. Cir. 1989); *Cornejo-Ortega v. United States*, 61 Fed. Cl. 371, 373 (2004). An implied-in-fact contract must be "founded upon a meeting of the minds, which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding." *Hercules, Inc. v. United States*, 516 U.S. 417, 424 (1996) (quoting *Baltimore & Ohio R. Co. v. United States*, 261 U.S. 592, 597 (1923)); *see also L.P. Consulting Group, Inc. v. United States*, 66 Fed. Cl. 238, 242 (2005); *Moore v. United States*, 48 Fed. Cl. 394, 401 (2000). Such a contract between a private party and the United States arises only if: (i) there is mutuality of intent to contract; (ii) consideration; (iii) lack of ambiguity in offer and acceptance; and (iv) evidence that "[t]he government representative 'whose conduct is relied upon [had] actual authority to bind the government in contract.'" *City of El Centro v. United States*, 922 F.2d 816, 820 (Fed. Cir. 1990), *cert. denied*, 501 U.S. 1230 (1991) (quoting *Juda v. United States*, 6 Cl. Ct. 441, 452 (1984)); *see also Cornejo-Ortega*, 61 Fed. Cl. at 373. In the case *sub judice*, the question whether an implied-in-fact contract arose hinges initially on the statute authorizing the Accomplishments Program and the procedures adopted by the agency under that statute.

A host of cases have dealt with employee suggestion programs deriving from statutes that, like the statute *sub judice*, are framed in permissive terms, *e.g.*, that an agency "may" pay an

award to an employee for a beneficial suggestion. *See, e.g.*, *Martilla v. United States*, 118 Ct. Cl. 177 (Ct. Cl. 1950). These cases generally hold that, where a suggestion is rejected by the agency, an implied-in-fact contract entitling the employee to an award does not arise. *See Rosano v. United States*, 9 Cl. Ct. 137, 145 (1985) (Miller, P., J.), *aff'd*, 800 F.2d 1126 (Fed. Cir. 1986), *cert. denied*, 480 U.S. 907 (1987); *McGee v. United States*, 5 Cl. Ct. 480, 482 (1984). Nor may these employees recover based upon the authorizing statute itself, these cases teach, because the permissive language of such statutes is not money-mandating and thus cannot give rise to jurisdiction under the Tucker Act. *See Adair v. United States*, 648 F.2d 1318, 1322 (Ct. Cl. 1981); *Contreras v. United States*, 64 Fed. Cl. 583, 598 (2005), *aff'd*, 168 Fed. Appx. 938 (Fed. Cir. 2006) (construing 5 U.S.C. § 4523(a)); *Rosano*, 9 Cl. Ct. at 145 (construing 5 U.S.C. § 4503); *see also Uraga v. United States*, 4 Cl. Ct. 106, 109 (1983).[2] In so concluding, several of these cases distinguished these award statutes from other statutes framed in permissive terms, such as the moiety statute that was deemed to be money-mandating in *Doe v. United States*, 100 F.3d 1576 (Fed. Cir. 1996). *See Contreras*, 64 Fed. Cl. at 597-98.[3] But once we pass beyond cases involving rejected solutions to those involving accepted ones, the decisional landscape turns rocky and inhospitable.

---

[2] In *Contreras*, 64 Fed. Cl. at 588-592, this court analyzed the Supreme Court's recent decision in *United States v. White Mountain Apache Tribe*, 537 U.S. 465 (2003), and concluded that the latter decision did not fundamentally alter the traditional formulation of what constitutes a money-mandating statute. Rather, as *Contreras* demonstrated, the standard remains whether the source of substantive law can "fairly be interpreted as mandating compensation by the Federal Government for the damages sustained." *United States v. Mitchell*, 463 U.S. 206, 216 (1983); *see also Fisher v. United States*, 402 F.3d 1167, 1173-74 (Fed. Cir. 2005) (en banc).

[3] The moiety statute considered in *Doe* provides a list of conditions precedent that must be met in order for an individual to obtain an award for information regarding a customs violation. 19 U.S.C. § 1619. As originally enacted in 1930, that statute gave the Secretary of the Treasury very little discretion in setting the amount of the award, requiring it to be "25 percentum of the net amount recovered, but not to exceed $50,000." *See* Tariff Act of 1930, Pub. L. No. 361, § 619, 46 Stat. 590, 758. These limitations led the Court of Claims, in *Tyson v. United States*, 32 F. Supp. 135, 137 (1940), to conclude that the Secretary's failure to make an award under this statute was reviewable under the Tucker Act. *See also Rickard v. United States*, 11 Cl. Ct. 874, 878 (1987). *Doe* held that *Tyson* was still good law under the 1986 version of the statute, which afforded the Secretary greater discretion. It reached that conclusion based upon legislative history, *see* 100 F.3d at 1581-82 (discussing H.R. Rep. No. 794, at 16-17 (1986)), and its belief that had Congress disagreed with the prior interpretation of the moiety statute, it would have legislatively overruled it, *id*. (citing *Anthony v. Office of Personnel Management*, 58 F.3d 620, 626 (Fed. Cir. 1995)). Here, we have neither a statute that is as conditioned as the moiety statute, any legislative history suggesting that an award should be mandatory in some circumstances, nor any basis to apply the legislative reenactment doctrine. *Doe* certainly cannot be read to apply in such circumstances – particularly, since the Federal Circuit there took pains to distinguish *Adair*, an earlier Court of Claims decision that involved an employee incentive program under a statute similar to 5 U.S.C. § 4503. *See Doe*, 100 F.3d at 1581.

Before us, on one side of that cragged landscape, are cases dealing with employee suggestions that were accepted, in which courts have concluded that the decision whether to provide an award and, if so, the amount thereof, is subject to abuse of discretion review. *See, e.g., Griffin v. United States*, 215 Ct. Cl. 710 (Ct. Cl. 1978); *Serbin v. United States*, 168 Ct. Cl. 934 (Ct. Cl. 1964). Some of these proceed upon the belief that, upon acceptance of the suggestion or the authorization of an award, an implied-in-fact contract arises binding the agency to act in accordance with its previously-established procedures, the terms of which the courts viewed as constraining the agency's exercise of discretion. *See, e.g., Griffin*, 215 Ct. Cl. at 714; *Ridenour v. United States*, 44 Fed. Cl. 202, 207 (1999); *Cooley v. United States*, 1997 WL 325846 (E.D. Pa. 1997). Other cases, however, seem to apply the abuse of discretion standard without regard to whether a contract existed, simply reasoning that the agency's exercise of discretion under the program was not absolute and thus, *per force*, must be subject to judicial review, again often by reference to the program's procedures. *Shaller v. United States*, 202 Ct. Cl. 571, 596 (Ct. Cl.), *cert. denied*, 414 U.S. 1092 (1973); *Serbin v. United States*, 168 Ct. Cl. at 935. Further adding to the complexity of the terrain, while some of these cases appear to be sensitive to the existence *vel non* of language in the program's procedures that could be construed as mandating the payment of compensation in some instances, *see, e.g.,Ridenour*, 44 Fed. Cl. at 207-08, others apparently viewed the precise content of the procedures to be largely irrelevant or uninformative, *see, e.g.*, *Griffin*, 215 Ct. Cl. at 714. Looming at the far end of this rugged landscape is one last decision, *Kempinski v. United States*, 164 Ct. Cl. 451, 453 (Ct. Cl.), *cert. denied*, 377 U.S. 981 (1964), in which the Court of Claims, albeit in *obiter dicta*, stated that the decision whether to make an award, even for an accepted suggestion, is purely discretional and never subject to review.

So where does this *tour d'horizon* leave us? Left to find its own way, this court readily would conclude that 5 U.S.C. § 4503 affords an agency with unfettered discretion to decide whether to make an award (or at least enough discretion to preclude judicial review). In the court's view, this conclusion should hold true even if the agency promulgates procedures and accepts a suggestion thereunder, unless those procedures can reasonably be construed to offer unconditionally an award in certain circumstances. Several reasons compel this conclusion.

First, it should not be overlooked that, like other award statutes, section 4503 explicitly provides the agency with discretion not in deciding whether to adopt a suggestion, but, rather, in deciding ***whether to make an award***. Hence, if the cases that have concluded that the Tucker Act does not provide jurisdiction to review the rejection of a suggestion are correct in holding that the reason for this is that the controlling statute is not money-mandating, then that rationale is just as true if an agency accepts a suggestion. Nothing in the statute is sensitive to the latter consideration – the statute remains not money-mandating, whether the suggestion is accepted or not. Ignoring this fact threatens to create an exception to the money-mandating analysis that could seriously undermine the rule – one simply talks in terms of every agency decision being subject to some form of abuse of discretion review, thereby obviating the necessity for determining whether a statute framed in permissive terms "can fairly be interpreted as mandating compensation." *United States v. Testan*, 424 U.S. 392, 401 (1976) (quoting *Eastport S.S. Corp. v. United States*, 372 F.2d 1002, 1009 (Ct. Cl. 1967)). With a slight twist, of course, these same sentiments can be expressed in contractual terms – the agency could always be viewed as having

entered into an implied-in-fact contract to exercise its discretion in a fashion that was neither arbitrary nor capricious. Extended to its logical end, this approach would run counter not only to the money-mandating analysis itself, but to several of its critical corollaries, including that waivers of sovereign immunity "must be unequivocally expressed," *United States v. King,* 395 U.S. 1, 4 (1969); *see also Irwin v. Veterans Adm.*, 498 U.S. 89, 94 (1990), and that mere violations of a statute or regulation do not give rise to Tucker Act jurisdiction, *see, e.g., Testan*, 424 U.S. at 401 (rejecting the argument that "all substantive rights of necessity create a waiver of sovereign immunity such that money damages are available to redress their violation"). *See also Eastport S.S. Corp*, 372 F.2d at 1013. Of course, the temptation is to view this sort of judicial review as being benign, at least as long as the agency is afforded broad discretion and corresponding deference. But, that courts affording agencies such discretion have almost always upheld the exercise thereof does not mask the fact that the procedures employed by the agencies often do not readily yield criteria by which to judge an agency decision, thereby begging the question whether the decision should be reviewable at all. (Indeed, were this same, more liberal approach extended to other areas of the law, the impact might not be so benign.)

This is not to say that the prior precedents necessarily have to be read in this fashion. Yet, if the law in this area is to be reconciled, the only basis on which a disappointed employee should be able to proceed is in contract. For that contract theory to be viable, and yet not circumvent the money-mandating analysis, a contract must arise based upon an agency's procedures that hold out some prospect that an accepted suggestion will be met with an award. *See, e.g., Herrick v. United States*, 846 F.2d 725, 726 (Fed. Cir. 1988); *see also Grav v. United States,* 14 Cl. Ct. 390, 393 (1988), *aff'd*, 866 F.2d 1305 (Fed. Cir. 1989). If the agency's procedures, instead, make clear that the decision whether to make an award is entirely reserved to the agency, even upon the acceptance of a suggestion and no matter the benefits derived therefrom, then no implied-in-fact contract ensuring an award is formed. *Krug v. United States*, 168 F.3d 1307, 1310 (Fed. Cir. 1999); *cf. Hanlin v. United States*, 316 F.3d 1325, 1330 (Fed. Cir. 2003) (no implied-in-fact contract where "[w]e discern no language in the statute or the regulation that indicates an intent to enter into a contract"); *Baker v. United States*, 50 Fed. Cl. 483, 498 (2001) (no contract formed "because the statute and the regulations cannot be characterized fairly as an offer"). One looking for an example of language with the latter effect seemingly need look no further than the DLA Manual, which emphasizes repeatedly that "[a]n award is not an entitlement," and that "[t]he decision to grant or not to grant an award . . . is a management prerogative." DLAM 1432.1, §§ 1-7(e), 2-2(g). But whether this is true or not, it remains that where an agency reserves for itself the decision to make an award, it makes no offer which can be accepted by performance – rather, the employee assumes the risk that his or her suggestion, even if accepted, will result only in the proverbial pat on the back.

That said, this court fortunately does not need to break new ground here, because a narrower basis of decision is sufficient to resolve this case. In short, it appears that plaintiff has not created a genuine issue of material fact as to whether her suggestion was accepted by an agency official with the authority to do so.

Plaintiff has offered no probative evidence that her suggestion was officially accepted. Instead, on this count, she attempts to pile conjuncture upon speculation, principally by relying

on proposal evaluation forms and e-mails that suggest that several of her supervisors recommended the acceptance of her suggestion and that other employees were unsure whether the suggestion had been accepted. There is no indication, however, that any of these documents come from individuals who had actual knowledge whether her suggestion had, in fact, been accepted. Conversely, defendant has offered clear evidence that the suggestion ultimately was rejected, producing, in this regard, a letter from the Assistant Director of the Procurement Program Management Group at DLA, which states "[t]he suggestion was disapproved due to the fact that the problem is already in the process of being resolved within the MOCAS System." Indeed, it is important to put this letter in context. Thus, the record reveals that DLA had detailed procedures for tracking suggestions, each of which was to be submitted on a uniquely numbered form, which allowed the suggestion to be tracked through the review process. As such, it is telling that despite the existence of this process and the fact that plaintiff has had a full opportunity to discover the documents produced as part of that process, plaintiff has not produced a single document indicating that her suggestion was approved. In fact, when asked at her deposition whether she had received "formal notice from the DLA saying that [her] suggestion was accepted," plaintiff candidly responded, "the answer is no." And the reason that no notice was received appears to be that it was not given, as the suggestion was not accepted.

Plaintiff attempts to counter the latter conclusion by suggesting that her idea not only was accepted, but implemented. Yet, her evidence in this regard is as sketchy and inadequate as above. While some of the documents that she has produced suggest that modifications that bore some similarities to her suggestion were being implemented, other, unrebutted documents make amply clear that those changes derived from a separate, unrelated recommendation that was adopted by the agency around the time of plaintiff's suggestion. In one deposition, an employee of the Defense Contract Management Agency stated that she knew "definitely" that the suggestion had not been implemented.[4] And even plaintiff's sister acknowledged that certain key features of her sibling's suggestion had never been implemented, even as part of the changes that the agency otherwise made. Moreover, while plaintiff relies heavily on e-mail exchanges between

---

[4] The following is the relevant passage from the deposition:

Q. Ms. Hill, do you know whether or not the suggestion that Ms. Anderson submitted was accepted by the government?

A. It was not.

Q. Do you know if it was implemented?

A. I know definitely it wasn't implemented. No.

Q. Okay. Let's go back to the acceptance. How do you know that it wasn't accepted?

A. Because we still cannot receive any information, payment information, from SAMMS to MOCAS.

lower level employees noting that plaintiff's suggestion had been implemented and discussing the possibility of giving her an award, it is more telling that one of the e-mails in this series, written by a supervisor, asks for "proof" of the implementation and of the savings supposedly associated therewith.[5] Yet, there is no e-mail indicating that proof was ever provided. Other e-mails and deposition testimony on which plaintiff relies indicate that a suggestion was implemented, but inexplicably refer to a suggestion number (USPH98–006) that appears to be different than the one assigned to plaintiff's suggestion (98-DP-008).[6] Accordingly, these materials are evidence of nothing, except perhaps the existence of further confusion among certain employees regarding the status of plaintiff's suggestion and award. As is true then of all of plaintiff's factual submissions, these documents fall short of creating a material question of fact as to whether the suggestion in question was actually implemented.

Nor has plaintiff shown that her suggestion was accepted by someone who had the authority to obligate the United States. *See Trauma Serv. Group v. United States*, 104 F.3d 1321, 1325 (Fed. Cir. 1997). None of the individuals at the DSCP that plaintiff indirectly has identified had the authority to approve the suggestion. In this regard, the DLA Manual indicated that while a suggestion could be "disapproved at any level," DLAM 1432.1, §2-4(j), such a suggestion could be approved only by "the benefitting organization at, as a minimum, a management level higher than the individual who recommended the award or use of the suggestion or invention." *Id*. at § 1-7(a)(1). Because plaintiff's suggestion benefitted the DLA, as a whole, it appears that no one at the DSCP, including all the individuals with whom plaintiff communicated, had the authority to approve her suggestion. Plaintiff certainly has not shown otherwise, even after being afforded a second opportunity by the court to present evidence on this point. Nor, for that matter, has plaintiff begun to show that someone with the requisite authority actually approved an award – the e-mails she has provided simply indicate that several individuals within her supervisory chain at the DSCP were in favor of her receiving such an award or perhaps thought an approval had occurred. But, these e-mails go no further. Accordingly, plaintiff has not shown, at least adequately to create a question of fact, that either her suggestion or an award were approved by an official authorized to do so. In the absence of action by an authorized person, the court concludes that, as a matter of law, no contract – either implied-in-fact or express – arose here. *See Fleming v. United States*, 413 F.Supp. 2d 503, 506 (E.D. Pa. 2005) (no implied-in-fact

---

[5] The particular e-mail, sent by Patricia Clark, who was a procurement analyst in the DPSC, states, "By the way, could you get something in writing from whoever called you to tell you it was implemented – we'll need that as 'proof' when sending the award back." A subsequent e-mail from Ms. Clark similarly asks for "help verifying savings" from the supposedly implemented project to help her in calculating an award.

[6] In her complaint, plaintiff alleges that her suggestion was numbered "USPOH-7-998." However, that number does not appear on the face of her suggestion form. And while a document in the record suggests that suggestion "USPOH-7-998" was implemented, that document also indicates that the implementation occurred around September of 1997, before plaintiff even submitted her suggestion. Of course, apart from these bits and pieces of information, the most important thing is that plaintiff has not clarified this matter, at least adequately enough to create a true question of fact.

contract for a reward arose where the person with whom the claimant dealt lacked the authority to bind the United States); *see also Grismac Corp. v. United States*, 556 F.2d 494, 498 (Ct. Cl. 1977).

What has been said suffices to demonstrate that plaintiff's contract claim is not well-taken. Plaintiff's second claim – for money damages based on unjust enrichment – fares even worse, as it must be dismissed for lack of jurisdiction. The Federal Circuit has made clear that this court does not have jurisdiction to provide relief for implied-in-law contracts. "It is well established," that court has stated, "that the Court of Federal Claims does not have the power to grant remedies generally characterized as those implied-in-law, that is equity-based remedies, as distinct form those based on actual contractual relationships." *Amer. Tel. & Tel. Co. v. United States*, 124 F.3d 1471, 1479 (Fed. Cir. 1997) (citations omitted); *see also Hercules v. United States*, 516 U.S. 417, 423 (1996) ("We have repeatedly held that this jurisdiction extends only to contracts either express or implied in fact, and not to claims on contracts implied in law."). And this rule has been applied to claims based upon unjust enrichment. *See, e.g., Cross Country Indus., Inc. v. United States*, 231 Ct. Cl. 899, 901 (Ct. Cl. 1982) ("A claim based on unjust enrichment is a claim based on a contract implied in law and we cannot hear it."); *see also Aetna Casualty & Surety Co. v. United States*, 655 F.2d 1047, 1059-60 (Ct. Cl. 1981); *Cleveland Chair Co. v. United States*, 557 F.2d 244, 246 (Ct. Cl. 1977); *Rinner v. United States*, 50 Fed. Cl. 333, 336 (2001) ("The Tucker Act . . . does not confer power to enforce promises through principles of equity and unjust enrichment, no matter how compelling a plaintiff's equitable claim may be."). Hence, this claim must be dismissed.

## III. CONCLUSION

This court need go no further. Based upon the foregoing, it concludes that defendant is entitled to judgment, as a matter of law, on plaintiff's implied-in-fact contract theory and that the court lacks jurisdiction over plaintiff's unjust enrichment claim. The Clerk is hereby directed to dismiss the complaint.

**IT IS SO ORDERED**.

s/ Francis M. Allegra
Francis M. Allegra
Judge